In the Matter of ALFRED WEINTRAUB, an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, June 2, 1987

## APPEARANCES OF COUNSEL

*Jeanne C. O'Rourke* of counsel *(Michael A. Gentile,* attorney), for petitioner.

*Robert E. Goldman* of counsel *(Shaw, Goldman, Licitra, Levine & Weinberg, P. C.,* attorneys), for respondent.

## OPINION OF THE COURT

Per Curiam.

Respondent Alfred Weintraub was admitted to practice in the Second Department on October 25, 1950. He has, however, maintained a law office within the First Department at all times relevant herein.

After an extensive hearing before a Departmental Disciplinary Hearing Panel, respondent was adjudged guilty of (1) failing in his capacity as escrow agent to exercise adequate control over his clients' escrowed funds once they had been turned over to a third party for a limited and proper purpose; and (2) failing to give his clients timely notice that a conversion of the escrowed funds had occurred. In light of these findings, the Panel has recommended that respondent be suspended from the practice of law for 90 days. One Panel member dissented, voting in favor of limiting respondent's sanction to a censure.

Initially, it should be noted that the Hearing Panel's very thorough findings of fact and conclusions of law are well supported in the voluminous record before us and we see no reason why they should not be confirmed. The more difficult question is what sanction should be imposed under the particular circumstances here obtaining.

Complainants in this proceeding are members of the Fischer family (hereinafter the Fischers). In 1971, the Fischers contracted to sell to George Mehlman two family-owned corporations whose assets included approximately 1,800 leasehold interests. Before the closing, Mehlman initiated a series of assignments as a result of which his interest in the Fischer corporations was finally transferred to Heather Associates, a limited partnership consisting of Mehlman, Lewis Lubitz, and S. Howard Goldman as limited partners, and a company known as Harvel as the general partner. At the closing, the Fischers were given a promissory note evidencing the purchaser's obligation for $6,786,418.51 of the $9.5 million sale price. The note was to be paid in installments so as to limit the

Fischers' tax liability. Both the note and the contract of sale provided that in the event the purchaser refinanced the mortgages on the leaseholds transferred incident to the sale of the stock of the Fischer corporations, the purchaser would deliver to William Weintraub as escrow agent, collateral additional to that already pledged equivalent to half the proceeds derived from the refinancing. Accordingly, when at the closing, and shortly thereafter, the mortgages on the subject leaseholds were refinanced, collateral amounting to approximately $3,924,000 in CDs was delivered to respondent, Albert Weintraub, who succeeded his deceased father, William Weintraub, as the escrow agent designated by the Fischers. The Weintraubs, father and son, had represented the Fischers in legal matters since the 1930's.

Once refinancing had occurred, the contract of sale authorized the Fischers to demand "prepayments" not exceeding $875,000 per year, which "prepayments" were to be reimbursed from the escrow fund. Aside from directions concerning the manner in which the "prepayments" were to be effectuated, the contract contained no other instructions governing the escrow agent's handling of the fund.

The delivery of moneys to an escrow account under the supervision of the Fischers' attorney, the contents of which were available to the Fischers in amounts up to $875,000 per year, raised the possibility that the taxing authorities might perceive the escrowed funds as constructively received by the Fischers. In an attempt to minimize the risk that the escrow fund would be so perceived, and the risk of the serious tax consequences which would follow thereupon, the Fischers and the purchasers agreed in the contract of sale that the CDs delivered to the escrow fund would remain in the name of the purchaser.

From 1972 through 1977, annual "prepayments" were demanded by the Fischers and duly made by the purchasers. During this period, Mehlman supplied the Fischers directly with regular statements showing the status of the escrow account. The Fischers also dealt with Mehlman extensively in several other ventures. Indeed, relations between Mehlman and the Fischers were sufficiently close for the Fischers in 1974 to release $300,000 of the escrowed funds to Mehlman as a personal loan.

The first problem with the escrow arrangement developed in 1973. At that time, respondent turned over a number of CDs

from the escrow account to George Mehlman with instructions that their proceeds be applied to a "prepayment" and the remaining sum be put into new CDs to be returned to the escrow fund. Rather than return the new CDs to respondent, the bank delivered the CDs to Mehlman, Goldman, and Lubitz, the Heather partners in whose names they had been issued. Although Mehlman and Goldman forwarded the CDs in their names to respondent, Lubitz refused. A lawsuit against Lubitz for the return of the CD withheld by him was not commenced by respondent until 1976. Its settlement did not occur until 1979.

Despite this unfortunate episode, respondent in 1975 decided at Mehlman's urging to turn over all the CDs in the escrow account to Mehlman so that Mehlman and the other Heather partners in whose name the CDs had been placed could more easily roll them over at 1- to 6-month intervals and thereby take advantage of the then fluctuating interest rates. The CDs were, accordingly, delivered to Mehlman. Respondent retained only photocopies of the turned over instruments. Aside from the photocopies, respondent kept no other records concerning the CDs and made no provisions to monitor their status. Difficulties in preserving the identity of the CDs as constituents of the escrow fund soon followed.

In December 1976, Lubitz commenced an action for an accounting against Mehlman and Heather Associates. A receiver was assigned to marshal the partnership's assets and the transfer of the partnership assets was enjoined. Among the partnership assets frozen by the injunction were certain escrow CDs in the name of Heather Associates. Although respondent communicated with the court concerning the Fischers' claim to the CDs, no other action was taken for fear that too aggressive a claim upon the CDs would draw the attention of the IRS and precipitate the unravelling of the Fischers' tax avoidance strategy.

In March 1977, respondent became aware that Mehlman had converted escrow CDs by hypothecating them to secure a personal loan. From the record, which contains conflicting assertions on the point, it would appear that respondent may not have notified the Fischers of the conversion. And while he did attempt to "cure" the conversion by obtaining from Mehlman an assignment of his interest in the Kips Bay Tower Company, he did not make a UCC filing of the assignment. Moreover, respondent took no additional steps to safeguard

the remaining escrow CDs in the possession of Mehlman and the other Heather Associates partners.

In the mid-1970's, Heather Associates transferred the leaseholds acquired pursuant to the 1971 contract of sale to a real estate concern known as Moral II. Moral II, which eventually went into bankruptcy, defaulted on its payments to Heather Associates in late 1977 and Heather, in turn, defaulted on the interest payments it was obligated to make on the promissory note given the Fischers pursuant to the 1971 contract. Respondent informed the Fischers of Heather's default by letter dated February 6, 1978 and stated that he would, in view of the default, turn over to the Fischers the collateral held by him as escrow agent, including the CDs. No mention was made by respondent of any problem in locating and obtaining the CDs, or in carrying through on his stated intention to release them to the Fischers. On learning of the default, the Fischers went directly to Mehlman to ascertain the status of the CDs and were given a list indicating as to each CD the bank of issuance, the face amount, the interest rate, and the due date.

Possibly earlier, but, in any event, no later than October 1978, respondent learned that Mehlman had converted the remaining escrow CDs. He did not, however, impart this knowledge to the Fischers who first became aware that the CDs were not "in existence anymore", while attending the Moral II bankruptcy proceeding in December 1978. Thereafter, a meeting was immediately convened by the Fischers with respondent and Mehlman. Mehlman confessed that he was wholly responsible for converting the CDs and stated that he had misled respondent when respondent inquired about the CDs. These admissions are contained in an undated confession prepared by respondent and executed by Mehlman.

As of December 1978, the outstanding CDs amounted to about $2.2 million. Since then the Fischers have recovered at least $1.3 million from Mehlman and the banks where the conversions occurred. While there is conflicting evidence as to whether the Fischers were eventually made whole, we note that the Hearing Panel concluded that the Fischers have recovered a substantial portion of the money lost as a consequence of the CDs' conversion.

A client clearly has a right to expect that an attorney will act competently as a custodian of funds entrusted to him *(Matter of Marks, 72 AD2d 399, 401)*. We agree with the

Hearing Panel that respondent did not maintain reasonable control over the escrow funds turned over to Mehlman and was remiss in failing to keep adequate records of the CDs *(see,* Code of Professional Responsibility DR 9-102), and that these failings render respondent's performance in his fiduciary capacity short of that to be expected, particularly from an attorney of his long experience. We agree also that respondent's inexcusable failure promptly to notify the Fischers that the CDs had been converted constituted a breach of his responsibilities as an escrow agent *(see,* Code of Professional Responsibility DR 1-102 [A] [6]).

These lapses notwithstanding, we cannot in fairness overlook the fact that respondent's duties as an escrow agent were never articulated in an escrow agreement, and that respondent's control over the CDs was, apart from his own failings, significantly impaired by the provision in the 1971 contract of sale requiring, for purposes of tax avoidance, that the CDs be in the purchaser's name. As undeniably sophisticated business people, the Fischers should have known, and indeed probably did know, that this requirement created a danger that in the very likely event the CDs were delivered to the purchasers to be "rolled over" they might then be converted. It should also have been anticipated that once such a conversion occurred the escrow agent would be significantly hampered in recovering the lost CDs since, as the 1976 Lubitz episode later demonstrated, any aggressive assertion of right to the CDs by the Fischers carried with it a significant risk of disastrous tax consequences. Given these dangers and limitations inherent in the 1971 contract, the entire responsibility for the conversions which, in fact occurred, cannot be placed with respondent for his deficient performance in his capacity as escrow agent.

It may be noted also that, although the CDs were delivered by respondent to Mehlman without authorization from the Fischers, the Fischers appear to have been well aware that the CDs were in Mehlman's possession and did not raise any objection to that arrangement. Indeed, the record shows quite clearly that the Fischers communicated regularly with Mehlman concerning the status of the CDs and on at least two occasions requested "prepayment" directly from him without using respondent as an intermediary. Tellingly, the Fischers, upon learning of the Heather default, went straight to Mehlman to obtain assurances as to the status of the CDs; Mehlman was someone with whom the Fischers had had extensive business dealings and whom they apparently trusted and

relied on. This does not excuse respondent's failure properly to monitor the CDs held by Mehlman and the other Heather partners. It does, however, show that the Fischers knowingly assumed and acquiesced in the risk of having the CDs held by the purchasers, and participated in a course of dealing which tended to reduce their escrow agent's function to that of a figurehead.

To these considerations must be added the observation that respondent's acts and omissions, while sometimes reflecting failure in judgment, were not instinct with venal motive, or motivated by any desire for selfish gain. Respondent, at the age of 61, has, with the exception of the present matter, practiced honorably before the Bar for some 36 years. We do not think, in view of his prior record, and the nature of the misconduct for which he is here cited, that his continued practice will pose a threat to the public. Considering the record as a whole, we are of the opinion that respondent's sanction should be limited to that of a censure. *(Cf., Matter of Sylvan,* 104 AD2d 24; *Matter of Rogers,* 94 AD2d 121.)

Accordingly, the motion of petitioner Departmental Disciplinary Committee to confirm its Hearing Panel's findings of fact and conclusions of law should be granted, but the Hearing Panel's recommendation that respondent be suspended for a 90-day period is rejected, and respondent censured instead.

MURPHY, P. J., KUPFERMAN, ROSS, KASSAL and WALLACH, JJ., concur.

Petition granted only insofar as to confirm the Hearing Panel's findings of fact and conclusions of law, and respondent is censured.